UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMERICA BANK & TRUST, N.A. as Personal Representative of the Estate of Prince Rogers Nelson,<br><br>            Plaintiff,<br><br>v.<br><br>KIAN ANDREW HABIB,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil No. 17-12418-LTS<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 77, 84)

January 6, 2020

SOROKIN, J.

        This federal copyright law case concerns several audiovisual recordings of the now-deceased international superstar Prince Rogers Nelson ("Prince") performing his own musical compositions live in concert. Plaintiff Comerica Bank & Trust, N.A., in its capacity as the appointed Personal Representative of Prince's Estate ("Comerica"), alleges that several videos recorded and uploaded to YouTube by Defendant Kian Andrew Habib ("Habib") constitute copyright infringement under 17 U.S.C. § 501 and violate the civil anti-bootlegging statute, 17 U.S.C. § 1101. Doc. No. 27 at 4-5. In response, Habib raises multiple defenses to Comerica's two claims and counterclaims that takedown notices sent on behalf of Comerica to YouTube were "knowingly, material misrepresent[ations]" in violation of 17 U.S.C. § 512(f). Doc. No. 30. For the following reasons, Comerica's Motion for Partial Summary Judgment (Doc. No. 77) is ALLOWED IN PART and Habib's Cross Motion for Summary Judgment (Doc. No. 84) is DENIED.

I.      <u>BACKGROUND</u>[1]

Prince is one of the best-selling musical artists of all time. Doc. No. 81-7 at 2 (representing that Prince has sold over 100 million records worldwide). A virtuosic performer and prolific songwriter, Prince crafted a unique amalgam of funk, rock, rhythm and blues, and soul, yielding chart-topping studio recordings and electrifying live shows. <u>Id.</u>; <u>see also</u> Press Release, The White House, <u>Statement by the President on the Passing of Prince</u> (Apr. 21, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/04/21/statement-president-passing-prince ("He was a virtuoso instrumentalist, a brilliant bandleader, and an electrifying performer."). Over the course of his 38-year career, Prince also earned a reputation as a musician who demanded control over the release and use of his music, "enforc[ing] his intellectual property rights aggressively" to achieve that end. Doc. No. 81-7 at 2-3 (noting that Prince "employed staff whose sole task was to send take-down notices to [alleged] online infringers").

After Prince's untimely April 21, 2016 death, Comerica was appointed Personal Representative of Prince's Estate and assumed its current role as a "fiduciary charged with monetizing and protecting the Estate's intellectual property for the benefit of [Prince's] heirs." Doc. No. 83 at 2. In that capacity, Comerica now operates an official Prince YouTube channel, which includes live concert videos. <u>Id.</u> at 4. According to Comerica, the official Prince YouTube channel has yielded "well over $1 million" in revenue for the Estate. <u>Id.</u> Given the YouTube channel's success, Comerica "expects to monetize additional [Prince] concert videos in the future." <u>Id.</u>

---

[1] Unless specifically noted, these facts are undisputed.

As Comerica aims to maximize the impact of the official Prince YouTube channel, it also "makes a concerted effort to identify and remove unauthorized Prince videos on other channels" that might divert interest and revenue away from the Estate. Id. at 5. To that end, from March 2017 to March 2019, Comerica utilized the services of MarkMonitor, which deploys a "proprietary software [that] scours the internet for potential infringements of [] clients' trademarks and copyrights" and employs "experienced analyst[s]" who then review potential infringements before further action is taken. Doc. No. 81-8 ¶¶ 2, 5. Over the course of those two years, MarkMonitor "sent over 2,800 takedown notices" to YouTube on behalf of the Estate. Id. ¶ 4.

Five of those notices were sent in response to videos uploaded by Habib—the recordings at issue in this case. Id. ¶ 11. Habib filmed those recordings from his vantage point as an audience member at two different Prince performances, a December 27, 2013 concert at the Mohegan Sun Arena in Connecticut, and a May 23, 2015 concert at the Bell Centre in Montreal. Doc. No. 30 at 6-7. Habib concedes he did not have express authorization from Prince to record any portion of either performance. Doc. No. 110 ¶ 20.[2] Habib later uploaded five discrete portions of the two performances on YouTube: First, on February 28, 2014, Habib uploaded a 2 minute and 49 second audiovisual clip of Prince performing the song "Glam Slam" at the Mohegan Sun Arena, Doc. No. 30 at 7; next, on April 25, 2016, Habib uploaded a 4 minute and 48 second video including Prince's performance of "Nothing Compares 2 U" at the Mohegan Sun Arena concert, id.; finally, on May 24, 2016, Habib uploaded (1) a 2 minute and 23 second video of Prince performing the song "Guitar" live in Montreal, Doc. 80-8 at 35, (2) a 2 minute

---

[2] Habib does contend that Prince granted Habib an "implied license" to record and post the performances, citing a 2014 BBC article with statements attributed to Prince. See infra Part III.A.2.

and 25 second video of Prince performing the song "Take Me With U" in concert in Montreal, Doc. No. 30 at 8, and (3) a 3 minute and 25 second video of Prince performing the songs "Sign o' the Times," "Most Beautiful Girl in the World," and "Hot Thing," id.

These five audiovisual recordings—fairly described as "grainy," "blurry," and "poor quality"—each contain significant and recognizable portions of six musical compositions that Prince composed and registered with the United States Copyright Office. Doc. Nos. 78-1–78-8 (providing copies of U.S. Copyright Office Registration Certificates for "Nothing Compares 2 U," "Take Me With U," "Glam Slam," "Sign o' the Times," "The Most Beautiful Girl in the World," and "Hot Thing").[3] For example, Habib's audiovisual recording of "Nothing Compares 2 U" begins in the middle of the first verse of the song and continues until the end of the composition. Doc. No. 79-3 (Habib's video on file with the Court); Doc. No. 81-6 (highlighting the substantial portion of the song's lyrics captured by Habib's video). In each video, the camera is focused on Prince and his band, with Habib intermittently panning between the stage and a jumbotron screen that magnified the featured performers. See, e.g., Doc. No. 79-3; Doc. No. 79-6 (videos of "Nothing Compares 2 U" and "Sign o' the Times" on file with the Court). The parties do not dispute that Habib did not alter any aspect of the musical performances or the visuals captured by his recordings before he uploaded the videos to YouTube. Doc. No. 80-8 at 32; Doc. No. 81-4 at 22 ("I didn't add anything to the music or anything."). In addition, the parties do not dispute that Habib's videos do not capture any spoken commentary and merely

---

[3] While the parties do not dispute that Prince also composed the song "Guitar," Comerica does not have in its possession the copyright registration that likely encompasses that song. See Doc. No. 81-9; Doc. No. 78-9. Comerica notes that it is not asserting a copyright infringement claim based on Habib's use of "Guitar." Doc. No. 83 at 7 n.2. However, Comerica does assert that Habib's video of "Guitar" violated the anti-bootlegging statute, 17 U.S.C. § 1101. Id.

feature Prince's "spontaneous interactions with his fellow band members and the audience, as well as the singing of the crowd." Doc. No. 108 at 7.

Habib uploaded the five videos to the "PersianCeltic" YouTube channel that he operates. Doc. No. 110 at 11. When he did so, Habib gave titles to the various videos, see Doc. No. 83 at 6 (including titles like "Prince – Nothing Compares 2 U – Amazing LIVE rare performance – 2013" and "Prince showing off all his talents! LIVE at Mohegan Sun, Connecticut 2013"), but did not otherwise include any written commentary or criticism. Additionally, the parties do not dispute that Habib's "PersianCeltic" YouTube page included an "About" section that described his channel as containing "[e]clectic" and "awesome content," and encouraged YouTube users to "subscribe and comment." Doc. No. 80-7. As of November 6, 2018, Habib's channel had received 405,336 views, including thousands of views for each of the videos at issue in this case. Id.; Doc. No. 80-3.

In 2017, MarkMonitor identified Habib's videos as potentially infringing Prince's musical composition copyrights. Doc. No. 81-8 at 4. According to Erika Vergara, Client Services Manager at MarkMonitor, after Habib's five videos were flagged as potentially infringing, "a MarkMonitor analyst watched the videos and applied [the company's] standard practices, including an assessment of fair use."[4] Id. After concluding that the videos were infringing, MarkMonitor then sent takedown notices to YouTube on Comerica's behalf for each of Habib's five videos. Id.[5]

_____

[4] "Fair use," as discussed at length below, is an affirmative defense to copyright infringement. 17 U.S.C. § 107.

[5] This was not the first time that Habib had received notice that videos uploaded to his YouTube channel might contain infringing material. In fact, several other copyright owners—including copyright owners of songs performed by the rock band Arcade Fire and the pop star Miley Cyrus—had previously issued Content ID claims regarding Habib's videos of live musical

Upon receiving the takedown notices, YouTube removed the five videos and notified Habib. Doc. Nos. 79-8–79-10. Those notifications explained that, amongst other reasons, takedown notifications might have been issued because "[o]ne or more of [Habib's] videos contained copyrighted material." Doc. No. 79-1. YouTube further explained that "[c]opyright owners can choose to take down videos that contain their content" and informed Habib that YouTube had "disabled [access to the five videos] as a result of a third-party notification from [MarkMonitor] claiming that [the videos are] infringing." Doc. No. 78-11. Moreover, YouTube advised Habib that his account would be terminated if he did not "delete any videos to which [he] did not own the rights," id., and asked him to refrain from "upload[ing] videos that contain copyrighted content that you aren't allowed to use." Doc. No. 79-1.

In response, Habib submitted five identical counter-notifications, in each instance averring that his videos were "fair use" because the videos were, in Habib's view, "noncommercial and transformative in nature . . . use[d] no more of the original than necessary, and ha[d] no negative effect on the market for the work." Doc. No. 79-11. According to Habib, he submitted these counter-notifications "casually," Doc. No. 81-4 at 11 (transcript of Habib's deposition), and the parties do not dispute that Habib did not seek legal advice before submitting his counter-notifications. Doc. No. 80-8 at 10 (transcript of Habib's deposition). In fact, Habib

---

performances. See Doc. No. 80-6 (notifying Habib that "[c]opyrighted content was found in your video" and that "[t]he claimant is allowing their content to be used in your YouTube video" so that it could be monetized); see also Bryan E. Arsham, Monetizing Infringement: A New Legal Regime for Hosts of User-Generated Content, 101 Geo. L.J. 775, 791 (2013) (noting that YouTube's Content ID system "gives [copyright] holders three choices for how to deal with uploaded content that matches their work: monetize the content, track usage, or block the content altogether."). Habib did not dispute any of the claimants' Content ID claims "because [the claimants] weren't trying to remove the video forever from the channel." Doc. No. 80-8 at 24. Habib also stated that claimants' decisions to permit videos to remain on YouTube and generate revenue for the claimants, in his mind, "raise[d] the suspicion that the video is . . . not copyrighted." Id. at 24-25.

explained in his deposition that he used "a prewritten legal description of fair use" that he submitted because he "agree[d] with it." Id. at 16.

After receiving Habib's counter-notifications, YouTube provided Comerica with Habib's counter-notifications and informed Comerica that YouTube "await[ed] evidence . . . that [Comerica had] filed an action seeking a court order against [Habib] to restrain the allegedly infringing activity." Doc. No. 79-11. In response, Comerica filed the instant lawsuit, alleging musical composition copyright infringement and violations of the anti-bootlegging statute. Doc. No. 27. Notwithstanding the commencement of this case, Habib has continued to post videos that he recorded at live musical performances. Doc. No. 80-8 at 6 (stating in his deposition that "[t]here's nothing wrong with posting concert videos").

II.     LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to [] view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A court may enter summary judgment "against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When cross-motions for summary judgment are presented, the Court "must consider each motion separately" and draw all inferences against each moving party in turn. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

III. DISCUSSION

The Court considers, in turn, Comerica's two allegations: (1) that Habib's videos infringed Prince's copyrights; and (2) that Habib's videos violated the anti-bootlegging statute, 17 U.S.C. § 1101. Then, the Court addresses Habib's sole counterclaim, alleging that takedown notices sent on Comerica's behalf were violative of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(f).

A. Comerica's Claims

As to Comerica's claims—copyright infringement and violation of the anti-bootlegging statute—and Habib's affirmative defenses, the Court first considers Comerica's motion for summary judgment, drawing all reasonable inferences in Habib's favor. Then, the Court considers Habib's cross-motion for summary judgment on Comerica's two claims, as well as his motion for summary judgment on his affirmative defenses, drawing all reasonable inferences in Comerica's favor. Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts [the familiar summary judgment] standard of review.").

1.     Count I: Infringement of Prince's Musical Composition Copyrights

    a.     Infringement

"To establish copyright infringement, a plaintiff must concurrently proceed down two roads and prove two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 39 (1st Cir. 2012) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)).

The Copyright Act provides that copyright protection for musical compositions—like all other instances of copyright protection—vests initially in the composer.  See 17 U.S.C. § 201(a) ("Copyright in a work . . . vests initially in the author or authors of the work."); see also 17 U.S.C. § 102 (listing musical compositions as protectable subject matter under the Copyright Act and defining "musical works" to include "accompanying words").  Additionally, the Copyright Act states that "ownership of a copyright . . . may be bequeathed by will or pass as personal property by the applicable laws of intestate succession."  17 U.S.C. § 201(d).  Finally, "certificates of copyright [issued by the U.S. Copyright Office] are prima facie evidence of [a plaintiff's] ownership of valid copyright interests in [their] works."  Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC, 560 F.3d 53, 58 (1st Cir. 2009) (quoting 17 U.S.C. § 410(c)).

Here, there can be no dispute that Comerica, in its capacity as appointed Personal Representative of Prince's Estate, has demonstrated its ownership of valid copyrights in the six musical compositions at issue in its infringement claim.  See Doc. Nos. 78-1–78-8 (providing copies of U.S. Copyright Office Registration Certificates); Minn. Stat. Ann. § 524.3-709 (West 2019) (providing that, under Minnesota law, "every personal representative has a right to, and shall take possession or control of, the decedent's property . . . unless or until, in the judgment of

the personal representative, possession of the property by the personal representative will be necessary for purposes of administration").  Rather than dispute valid ownership, Habib argues that his videos do not infringe the six copyrights at issue in this case because he did not record Prince performing "studio versions" of his musical compositions.  Doc. No. 85 at 4.  Further, Habib argues that the copyright registrations in Comerica's possession do not "cover the live performances at issue in this suit."  Id. at 4 n.1.[6]

Habib's arguments misunderstand both the nature and scope of copyright protection for musical compositions.  First, as the U.S. Copyright Office explains, "[s]ound recordings and musical compositions are considered two separate works for copyright purposes."  U.S. Copyright Office, Circular 56A: Copyright Registration of Musical Compositions and Sound Recordings (Mar. 2019), https://www.copyright.gov/circs/circ56a.pdf (noting that "[e]ven though a sound recording is a derivative work of the underlying musical composition, a copyright in a sound recording is not the same as, or a substitute for, copyright in the underlying musical composition"); accord Conway v. Licata, 104 F. Supp. 3d 104, 120 (D. Mass. 2015).

---

[6] Additionally, Habib argues, in passing, that he "is the only person who can legally claim ownership of the copyright on his recording of Prince's live performance" because he is the "creator" of the videos at issue in this case.  Doc. No. 85 at 9.  While it is possible that Habib might enjoy copyright protection in aspects of videos that "satisf[y] the low threshold of originality required to earn copyright protection," Greene v. Ablon, 794 F.3d 133, 160 (1st Cir. 2015), any protection that Habib might enjoy in his "selection of . . . lighting, timing, positioning, angle, and focus," Harney v. Sony Pictures Television, Inc., 704 F.3d 173, 180 (1st Cir. 2013), or "where [he] put the microphones" of his cellphone, Panel III: United States v. Martignon-Case in Controversy, 16 Fordham Intell. Prop. Media & Ent. L.J. 1223, 1280 (2006) (quoting Professor Jane C. Ginsburg), most certainly does not extend to Prince's underlying copyrighted musical compositions captured by Habib's recordings.  See 17 U.S.C. § 103(b) (providing that the "copyright in [a derivative work] is independent of, and does not affect . . . any copyright protection in the preexisting material"); Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1112 (1st Cir. 1993) (noting that "[a]ny elements that the author of the derivative work borrowed from the underlying work . . . remain protected by the copyrights in the underlying work").

Comerica correctly observes that "copyrights in musical compositions cover the music (the melody, rhythm, and/or harmony) and accompanying words (lyrics)." Doc. No. 83 at 2. In fact, "if words and music have been integrated into a single work, the copyright in a 'musical work' protects against unauthorized use of the music alone or of the words alone, or of a combination of music and words." 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2.05[C]. Copyright protection for these components of a musical composition grants copyright owners— here, Prince's Estate—the exclusive right to "reproduce the copyrighted work in copies or phonorecords" and to "distribute copies or phonorecords of the copyrighted work to the public." 17 U.S.C. § 106. To that end, courts have consistently "recognized a copyright holder's right to control the synchronization of musical compositions with the content of audiovisual works and have required parties to obtain synchronization licenses from copyright holders." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 527 (9th Cir. 2008); see also ABKCO Music, Inc. v. Stellar Records, Inc., 96 F.3d 60, 63 n.4 (2d Cir. 1996) ("A synchronization license is required if a copyrighted musical composition is to be used in 'timed-relation' or synchronization with an audiovisual work.") (citation omitted), abrogated on other grounds by Salinger v. Colting, 607 F.3d 68 (2d Cir. 2010); 6 Nimmer on Copyright § 30.02 [F][3].

It is of no moment that the performances recorded by Habib were "far removed from, and not recognizable as, the studio version[s] of . . . particular song[s]." Doc. No. 85 at 4. Indeed, each performance of a given musical composition—whether fixed in a specific sound recording or played with a live band at a concert venue—falls well within the scope of the copyright protection afforded to musical compositions.[7] Notably, courts have consistently held that an

---

[7] For example, the copyright registration for Prince's composition "Nothing Compares 2 U"— one of the songs at issue in this case, Doc. No. 78-2 (reproducing the relevant certificate of registration)—protects (1) the "studio version" recorded by Prince in 1984 (but unreleased until

11

arrangement of a musical composition may not be considered a separate derivative work if the arrangement is "merely a stylized version of the original song . . . [that] may take liberties with the lyrics or the tempo" and regurgitates "basically the original tune." Woods v. Bourne Co., 60 F.3d 978, 991 (2d Cir. 1995); accord 1 Nimmer on Copyright § 2.05[D]. And courts have long held that the right to create new versions of a composition is an entitlement that lies at the core of the Copyright Act's protection of musical works. See Edward B. Marks Music Corp. v. Foullon, 79 F. Supp. 664, 665–66 (S.D.N.Y. 1948) ("There is no doubt that the copyright owner of a musical composition has a right to make a version and arrangement."), aff'd, 171 F.2d 905 (2d Cir. 1949). Accordingly, Comerica need not "separately register for copyright protection . . . every live performance of every [Prince] song" in order to avail itself of the Copyright Act's remedies, Doc. No. 83 at 3, nor does Comerica's infringement claim seek to "mold[] [the musical composition copyrights] beyond the material they actually protect," as Habib claims. Doc. No. 85 at 10.

Thus, drawing all reasonable inferences in Habib's favor, Comerica has firmly established copyright infringement as to the six copyrighted musical compositions.

---

2018), see Matthew Strauss, Listen to Prince's Original Version of "Nothing Compares 2 U," Pitchfork (Apr. 19, 2018), https://pitchfork.com/news/listen-to-princes-original-version-of-nothing-compares-2-u/; (2) the chart-topping 1990 version of the song recorded by Sinéad O'Connor, see Sinéad O'Connor, I Do Not Want What I Haven't Got (Chrysalis Records 1990); Gil Kaufman, Prince Estate Unveils Previously Unreleased Original 'Nothing Compares 2 U' Recording: Listen, Billboard (Apr. 19, 2018), https://www.billboard.com/articles/columns/rock/8351077/prince-previously-unreleased-original-nothing-compares-2-u-listen (noting that "the heartbreak anthem . . . became a breakout Billboard Hot 100 No. 1 hit" for O'Connor in 1990); and (3) Prince's December 27, 2013 performance of the song that Habib recorded at the Mohegan Sun Arena in Connecticut. See Doc. No. 79-6.

b.      <u>Affirmative Defenses</u>

Habib raises several affirmative defenses in his Answer to Comerica's Amended Complaint.  Doc. No. 30.  Like all defendants, Habib "bears the burden of proving such defenses."  <u>Getty Images (US), Inc. v. Her Campus Media, LLC</u>, No. 19-CV-11084-LTS, 2019 WL 5552332, at *1 (D. Mass. Oct. 28, 2019).  First, the Court considers whether, as Habib claims, his videos constitute "fair use" of the copyrighted musical compositions.  17 U.S.C. § 107; Doc. No. 30 at 5 (providing that Habib's third affirmative defense is "fair use").  Then, the Court takes up Habib's additional defenses.

1.      <u>Fair Use</u>

"The fair use doctrine is a statutory exception to copyright infringement."  <u>Bill Graham Archives v. Dorling Kindersley Ltd.</u>, 448 F.3d 605, 608 (2d Cir. 2006).  The doctrine "creates a privilege for others to use . . . copyrighted material in a reasonable manner despite the lack of the owner's consent."  <u>Gregory</u>, 689 F.3d at 59 (1st Cir. 2012) (quoting <u>Weissmann v. Freeman</u>, 868 F.2d 1313, 1323 (2d Cir.1989)).  It also "serves to mediate 'the inevitable tension between the property rights' lying in creative works 'and the ability of authors, artists, and the rest of us to express them,' providing a degree of protection to each where merited."  <u>Id.</u> (quoting <u>Blanch v. Koons</u>, 467 F.3d 244, 250 (2d Cir.2006)).

Section 107 of the Copyright Act codifies the fair use doctrine and sets forth the four familiar factors that a court must consider when the fair use defense is raised.  <u>See</u> 17 U.S.C. § 107 (noting that fair use may be found when a work is used "for purposes such as criticism, comment, news reporting, teaching, . . . scholarship, or research").  The four fair use factors are: (1) "the purpose and character of the use;" (2) "the nature of the copyrighted work;" (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole;"

and (4) "the effect of the use upon the potential market for or value of the copyrighted work."

Id. While "[f]air use is a mixed question of law and fact," Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 560 (1985), a court may properly resolve fair use at the summary judgment stage where, as here, "no material historical facts are at issue" and "[t]he parties dispute only the ultimate conclusions to be drawn from the admitted facts." Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 183 (D. Mass. 2007) (quoting Fisher v. Dees, 794 F.2d 432, 436 (9th Cir.1986)). Accordingly, the Court now considers each of the four fair use factors in turn.

### a. Purpose and Character of the Use

Under the first prong of the fair use analysis, the Court must assess "whether and to what extent the new work is 'transformative.'" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994) (quoting Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990)). That is, the Court must determine "whether the new work merely supersedes the objects of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Id.; accord Folsom v. Marsh, 9 F. Cas. 342, 345 (No. 4,901) (C. C. D. Mass. 1841) (Story, J.) (holding that a work is transformative when there is "real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work").

Habib posits that his videos are "transformative in nature because Habib specifically chose the vantage point to record from and alternated between shots of the performance and reactions from the crowd." Doc. No. 85 at 12. Additionally, he avers that the faint "bantering and [crowd] interactions" captured by his videos render them transformative. Id. Finally, he

argues that his "own comments and descriptions of the performances themselves"—ostensibly referring to his chosen titles for the videos, see, e.g., Doc. No. 83 at 6 (reporting that Habib gave his videos titles like "Prince – Nothing Compares 2 U – Amazing LIVE rare performance – 2013" and "Prince showing off all his talents! LIVE at Mohegan Sun, Connecticut 2013")— weigh in favor of recognizing his videos as transformative. Id.

These arguments miss the mark. Critically, Habib did not imbue Prince's musical compositions with new meaning or add any of his own expression to the underlying works. See Doc. No. 81-4 at 22 ("I didn't add anything to the music or anything."). As the First Circuit has held, this type of "verbatim" copying "reflects minimal intellectual labor and judgment." Gregory, 689 F.3d at 60. Typically, such "verbatim" copying may only be considered transformative when the copying serves "a purpose separate and distinct from the original artistic . . . purpose for which the [works] were created," like news reporting or documentary filmmaking. Bill Graham Archives, 448 F.3d at 610; see also Elvis Presley Enters., Inc. v. Passport Video, 349 F.3d 622, 628–29 (9th Cir. 2003) (finding the use of television clips of Elvis' musical performances to be transformative where "the clips play[ed] for only a few seconds and [were] used for reference purposes while a narrator talk[ed] over them or interviewees explain[ed] their context in Elvis' career," but not to be transformative where the clips "play[ed] without much interruption, [and t]he purpose of showing these clips likely [went] beyond merely making a reference for a biography, but instead serve[d] the same intrinsic entertainment value that is protected by Plaintiffs' copyrights"); Hofheinz v. A & E Television Networks, Inc., 146 F. Supp. 2d 442, 446–47 (S.D.N.Y. 2001) (holding that unauthorized use of film clips in an actor's biographical film was protected by the fair use doctrine because the clips were "not shown to recreate the creative expression reposing in plaintiff's [copyrighted] film,

[but] for the transformative purpose of enabling the viewer to understand the actor's modest beginnings in the film business").

Here, Habib's videos serve no such transformative purpose. In fact, the record is devoid of evidence that might support Habib's claim that his videos are "educational" or "historical" in nature. Doc. No. 86 at 7-8. And to the extent his video titles are original contributions, they are mere "message[s] of approval [that do] not endow the copyrighted material with any new purpose." Bell v. Pacific Ridge Builders, Inc., No. 19-cv-01307-JST, Doc. No. 21 (N.D. Cal. June 4, 2019); cf. Núñez v. Caribbean Int'l News Corp., 235 F.3d 18, 23 (1st Cir. 2000) (holding that "using [copyrighted] photographs in conjunction with editorial commentary" was transformative) (emphasis added). Indeed, as Comerica notes, Habib's videos do nothing more than "repackage or republish the original copyrighted [musical compositions]," Authors Guild v. HathiTrust, 755 F.3d 87, 96 (2d Cir. 2014), albeit in a "grainy" and "blurry" fashion. Doc. No. 80-8 at 26. Accordingly, the Court concludes that his videos are not transformative in nature.

Nonetheless, Habib additionally argues that the first fair use factor weighs in his favor because his videos are "non-commercial recording[s]," protesting that he "never sought or received any profit whatsoever" and "never even [began] . . . preliminary steps to monetize his YouTube account." Doc. No. 85 at 11. However, as the First Circuit has held, "removing money from the equation does not, under copyright law, remove liability for transgressing another's works." Gregory, 689 F.3d at 61. The Court's inquiry, therefore, does not end with a finding that Habib's use was non-commercial; rather, it turns on "whether [Habib] stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, 471 U.S. at 562. "'Profit,' in this context, is . . . not limited simply to dollars and coins; instead, it encompasses other non-monetary calculable benefits or advantages." Gregory, 689

F.3d at 61. Here, Habib sought to drive traffic to his YouTube channel by posting "rare" and "[a]mazing" videos of Prince performing his musical compositions in concert. See Doc. No. 80-7 (quoting Habib's user-facing description of the contents of his YouTube page as "awesome," and encouraging YouTube users "subscribe and comment you won't regret it!"). Thus, Habib stood "to gain recognition . . . through [his] posting of [Prince's musical compositions] online" and "benefitted by being able to provide the protected works free of cost" to other YouTube users. Penguin Grp. (USA) Inc. v. Am. Buddha, No. CV-13-02075-TUC-JGZ, 2015 WL 11170727, at *4 (D. Ariz. May 11, 2015); see also Northland Family Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform, 868 F. Supp. 2d 962, 979 (C.D. Cal. 2012) (holding that "[g]enerating traffic to one's website . . . using copyrighted material is within the type of 'profit' contemplated" by the first fair use factor). Accordingly, the "non-commercial" nature of Habib's videos is far from dispositive and, if anything, counsels against a finding of fair use. Therefore, the Court concludes that the first factor weighs decisively in Comerica's favor.

### b.    Nature of the Copyrighted Work

The second factor of the fair use inquiry requires the Court to consider two elements: (1) "whether the [musical compositions] are factual or creative," and (2) "whether the [musical compositions] have previously been published." Gregory, 689 F.3d at 61. First, as Comerica correctly states, musical compositions are highly creative works that fall within the core of copyright law's protection. See Leadsinger, Inc., 512 F.3d at 531 ("Original song lyrics are a work of creative expression, as opposed to an informational work, which is precisely the sort of expression that the copyright law aims to protect."); Campbell, 510 U.S. at 586 (holding that a Roy Orbison musical composition "falls within the core of the copyright's protective purposes"). As to the second element, there is no dispute that the musical compositions at issue in this case

were previously published by Prince.[8]  Nonetheless, the fact that these musical compositions were previously published and registered by Prince "does not mean that this inquiry weighs in favor of fair use, only that [the compositions] do not fall into the category of private works to which the doctrine of fair use is especially unsuited."  Fitzgerald, 491 F. Supp. 2d at 187.  Given that the works in question lie at the core of copyright law's protection, the second factor weighs against a finding of fair use.  See Cariou v. Prince, 714 F.3d 694, 710 (2d Cir. 2013) ("[T]here is no dispute that [plaintiff's] work is creative and published. Accordingly, this factor weighs against a fair use determination.").

c.      Amount and Substantiality of the Use

"The third factor requires [the Court] to consider 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole.'"  Gregory, 689 F.3d at 62 (quoting 17 U.S.C. § 107(3)).  This inquiry "must be a flexible one, rather than a simple determination of the percentage used," Núñez, 235 F.3d at 24, focusing on the significance, as well as the quantity, of the copied material.  See Rogers v. Koons, 960 F.2d 301, 311 (2d Cir. 1992) ("Even more critical than the quantity is the qualitative degree of the copying: what degree of the essence of the original is copied in relation to its whole.").  Notably, the third factor tilts against a finding of fair use when a party copies "the most interesting and moving parts" of a work,

---

[8] Comerica argues that because "Prince's live rendition of the works in Connecticut and Montreal were not [previously] published by Prince or his estate," Habib's videos implicated Comerica's "power to control whether, when, and how to release [this] material."  Gregory, 689 F.3d at 61.  However, given that this copyright infringement suit focuses on the six Prince musical compositions, the relevant inquiry is not whether the specific performances captured by Habib had been previously published but whether the underlying musical compositions had been published.  See Campbell, 510 U.S. at 586 (focusing the second fair use factor inquiry on the plaintiff's musical composition).

Harper & Row, 471 U.S. at 565, as well as "when more of the original is copied than necessary." Rogers, 960 F.2d at 311.

Habib argues that the third factor weighs in his favor because his videos, in aggregate, add up to "approximately 17 minutes" of run-time, which he contrasts with the "approximately 6 hours" total of the two Prince concerts he attended. Doc. No. 85 at 12. However, the relevant "analysis is not how much of the full concert Habib [copied and] distributed, but how much of each copyrighted musical composition he copied." Doc. No. 83 at 9; see also Campbell, 510 U.S. at 586–89 (treating a single song as a whole work for purposes of the fair use analysis). Habib's videos copied significant and valuable portions of the six musical compositions, in many cases capturing multiple verses and recognizable refrains. See, e.g., Doc. No. 79-3 (capturing almost all of "Nothing Compares 2 U," beginning at the middle of the first verse and continuing through the end of the composition); Doc. No. 79-6 (presenting the second verse and chorus of "Sign o' the Times"). Significantly, the videos "appropriated the heart" of the musical compositions, Harper & Row, 471 U.S. at 600, "providing the viewer with the best parts of each copyrighted work." Elvis Presley Enterprises v. Passport Entm't, No. CV 02-7042 RSWL(RZX), 2005 WL 6211336, at *1 (C.D. Cal. Nov. 22, 2005). And while "[c]opying does not become excessive . . . merely because the portion taken was the original's heart," Campbell, 510 U.S. at 588, when copying is carried out "'for the same intrinsic purpose for which [the composer] intended [the song] to be used,' this third factor weighs against [Habib's] contention of fair use." Gregory, 689 F.3d at 63 (quoting Marcus v. Rowley, 695 F.2d 1171, 1175 (9th Cir. 1983)). Accordingly, the third factor weighs in Comerica's favor.

d.     <u>Effect on the Market</u>

The fourth fair use factor probes "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Often said to be "the single most important element of fair use," <u>Harper & Row</u>, 471 U.S. at 566, the fourth factor directs courts to "consider both (1) the degree of market harm caused by the alleged infringer's actions, and (2) 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original.'" <u>Gregory</u>, 689 F.3d at 64 (quoting <u>Campbell</u>, 510 U.S. at 590). This factor does not consider "whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work." <u>Cariou</u>, 714 F.3d at 708 (quoting <u>Blanch</u>, 467 F.3d at 258).

Comerica avers that Prince's Estate "loses revenue whenever someone views an unofficial Prince video on another channel instead of an official Prince video on the official Prince channel." Doc. No. 81-7. Additionally, Comerica argues that the proliferation of "low quality videos," like Habib's, harms the Estate's ability to "preserv[e] . . . its reputation for excellence . . . [by] rob[bing] [the Estate] of the ability to control the quality distribution of its works." <u>Penguin Grp.</u>, 2015 WL 11170727, at *6; <u>see also</u> <u>Gregory</u>, 689 F.3d at 64 (noting that courts must "look[] beyond monetary or commercial" interests when assessing market harm). While the Court queries the extent to which the "grainy" and "blurry" visuals, muffled sound, and pervasive audience din in Habib's videos, <u>see, e.g.</u>, Doc. No. 79-6, "satisfy[] viewers' taste for videos of Prince performances," Doc. No. 83 at 22, even drawing all inferences in Habib's favor, his videos plainly divert traffic away from authorized reproductions of the musical compositions, thus depriving the Estate of advertising revenue. <u>See</u> <u>Sony BMG Music Entm't v.</u>

Tenenbaum, 672 F. Supp. 2d 217, 231 (D. Mass. 2009) (noting that "the widespread availability of free copies of copyrighted works on the internet has decreased [the plaintiff's] sales revenue, a market reality that other courts have credited"). Similarly, the Court is persuaded that Habib's decidedly poor-quality recordings harm the Estate's interest in policing the caliber of secondary uses of Prince's musical compositions. Indeed, the Copyright Act repeatedly demonstrates a commitment to musicians' right to protect the integrity of their compositions. See, e.g., 17 U.S.C. § 115(a)(2) (providing that a compulsory license to record a copyrighted musical composition does not include the right to "change the basic melody or fundamental character of the work"). Accordingly, the fourth factor counsels against finding fair use.

### e. Balance of the Factors

As all four statutory factors weigh in Comerica's favor, Habib's fair use defense fails as a matter of law. Gregory, 689 F.3d at 65 ("Having carefully balanced the scales, [the Court] conclude[s] that [Habib's] defense of fair use fails in full."). Habib has failed to "carry his evidentiary burden" as to his third affirmative defense to copyright infringement. Gregory, 689 F.3d at 59. Accordingly, Comerica's motion for summary judgment as to Habib's fair use defense is ALLOWED and Habib's cross motion for summary judgment on the fair use defense is DENIED.

### 2. Habib's Other Defenses to Infringement

Habib's additional defenses fare no better. As already discussed, Comerica has plainly stated a claim for copyright infringement; thus, Habib's first and second affirmative defenses fail. Doc. No. 30 at 4. Habib's fourth affirmative defense, which states that relief in this action is limited by 17 U.S.C. §504(c), provides no defense at all; it merely references the applicable statutory regime for determining damages in a copyright infringement case. Habib's fifth

defense, arguing that "his conduct was in good faith . . . and lacked any wrongful intent," is not a safeguard at the liability stage of a copyright infringement suit. <u>Daggs v. Bass</u>, No. CIV.A. 11-30070-FDS, 2012 WL 5878670, at *5 (D. Mass. Nov. 20, 2012) (noting that "intent is irrelevant to copyright infringement, at least at the stage of liability").[9]  Similarly, Habib's sixth defense, protesting that he should not be held liable because he did not profit from his use of Prince's compositions, also fails as a matter of law.  <u>Capitol Records, Inc. v. Alaujan</u>, 626 F. Supp. 2d 152, 155 (D. Mass. 2009) ("Non-commercial use is clearly not a complete defense to liability for copyright infringement, but only one of several factors considered as part of the fair use defense.").  Finally, Habib's seventh, eighth, and ninth defenses all fail, as there is no evidence that Comerica waived its infringement claim, that it was estopped from bringing that claim, or that the claim is time barred (i.e., the infringement at issue plainly occurred within three years of the commencement of this suit).

Thus, even drawing all reasonable inferences in Habib's favor, Comerica has firmly established the requisite elements of copyright infringement and established that Habib cannot carry his evidentiary burden as to any of his affirmative defenses.  Thus, Comerica's motion for summary judgment is ALLOWED as to its claim of copyright infringement and as to Habib's affirmative defenses; accordingly, Habib's cross motion for summary judgment as to the same is DENIED.[10]

---

[9] Intent, however, "is relevant to the question of whether infringement was willful, and can be important in determining the amount of damages."  Id. at *5 n.3; <u>see</u> <u>infra</u> (discussing whether Habib's infringement was willful).

[10] Habib's tenth affirmative defense mirrors his counterclaim and is addressed in detail below. <u>See</u> <u>infra</u> Part III.B.  In any event, his allegation that MarkMonitor's take-down notifications violated the DMCA is not an affirmative defense to copyright infringement.

c.      Willful Infringement

The Copyright Act permits a court to "increase the award of statutory damages to a sum of not more than $150,000" where a defendant's infringement is willful. 17 U.S.C. § 504(c)(2). "Infringement is willful if the defendants knew or should have known that their conduct constituted copyright infringement, or acted in reckless disregard of the copyright holder's rights." Homeowner Options for Massachusetts Elders, Inc. v. Brookline Bancorp, Inc., 789 F. Supp. 2d 242, 244 (D. Mass. 2011); accord Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 507 (1st Cir. 2011). "Although courts are generally reluctant to dispose of a case on summary judgment when mental state is at issue, it is permissible to do so where there are sufficient undisputed material facts on the record to make the question appropriate for summary judgment." Lipton v. Nature Co., 71 F.3d 464, 472 (2d Cir. 1995).

Comerica contends that, at a minimum, there is undisputed evidence that Habib acted with reckless disregard, thereby entitling Comerica to a finding of willfulness on their claim of copyright infringement. Doc. No. 83 at 24. The Court concurs. Notwithstanding the fact that Habib received—and did not dispute—multiple Content ID claims informing him that his audiovisual recordings of live musical performances contained copyrighted material, Habib continued to post similar videos, assuming that he would escape legal liability merely because some copyright owners elected to allow his videos to remain live. Doc. No. 80-8 at 24 (admitting that "[i]t's the artist's choice" to decide whether a video containing infringing material should remain published on YouTube); see also Broad. Music, Inc. v. C.B.G., Inc., No. CIV.A. 11-40142-TSH, 2013 WL 6074121, at *5 (D. Mass. Nov. 15, 2013) (holding that it is willful to ignore "repeated notices" and warnings that behavior constitutes copyright infringement). Indeed, his unflagging conviction—one that he has maintained throughout this

copyright infringement suit—that "every artist . . . encourage[s] people to post video[s]" of live musical performances, Doc. No. 80-8 at 25, demonstrates an unreasonable disregard for the exclusive rights afforded to musicians under the Copyright Act. 17 U.S.C. § 106. Moreover, his "casual[]" counter-notification submissions, Doc. No. 81-4 at 11, recklessly assumed that parroting the statutory fair use factors is an adequate substitute for either seeking out legal advice or carefully evaluating the applicability of the fair use doctrine. Finally, Habib has presented no mitigating evidence tending to show that he held a "reasonable" belief that his videos were not infringing. See, e.g., Broad. Music, Inc. v. Arlos, 682 F. Supp. 1, 2 (D. Mass. 1986) (holding that a "defendant must demonstrate not only a good faith belief that the infringement was innocent, but that his belief was reasonable").

For these reasons, Comerica's motion for summary judgment that Habib engaged in willful infringement of Prince's musical composition copyrights is ALLOWED and Habib's cross-motion is DENIED.

2.  Count II: Violation of the Anti-Bootlegging Statute

In addition to its copyright infringement claim, Comerica alleges that Habib's actions violate the civil anti-bootlegging statute, 17 U.S.C. § 1101. Section 1101(a), also known as the "anti-bootlegging statute," provides:

(a) Unauthorized acts. Anyone who, without the consent of the performer or performers involved—

(1) fixes the sounds or sounds and images of a live musical performance in a copy or phonorecord, or reproduces copies or phonorecords of such a performance from an unauthorized fixation,

(2) transmits or otherwise communicates to the public the sounds or sounds and images of a live musical performance, or

(3) distributes or offers to distribute, sells or offers to sell, rents or offers to rent, or traffics in any copy or phonorecord fixed as described in paragraph (1),

regardless of whether the fixations occurred in the United States, shall be subject to the remedies provided in sections 502 through 505, to the same extent as an infringer of copyright.

17 U.S.C. § 1101(a).

a.    The Anti-Bootlegging Statute's Protections

Actions brought under the civil anti-bootlegging statute are not copyright infringement claims; this is so because "the protections that the anti-bootlegging statute[] confer[s] on musicians are best described as 'quasi-copyright' or sui generis protections."  United States v. Moghadam, 175 F.3d 1269, 1273 (11th Cir. 1999).  Arising out of the international Agreement on Trade Related Aspects of Intellectual Property ("TRIPs"),[11] the anti-bootlegging statute creates copyright-like protection that is distinct from copyright protection in two important ways.

First, the anti-bootlegging statute extends protection to certain musical works—live performances—that have not yet been fixed in a tangible medium (such as a musical score or a sound recording), thus bypassing copyright law's fixation requirement.  See U.S. Const. art. I, § 8, cl. 8 (providing that "Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors . . .  the exclusive Right to their [] Writings") (emphasis added); Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884) ("By writings in that clause is meant the literary productions of those authors . . . includ[ing] all

---

[11] TRIPs became law by operation of the Uruguay Round Agreements Act ("URAA"), Pub.L. No. 103–465, 108 Stat. 4809 (1994).  Specifically, Congress enacted Section 1101(a) in reaction to Article 14(1) of the TRIPs agreement, which requires:

> In respect of a fixation of their performance on a phonogram, performers shall have the possibility of preventing the following acts when undertaken without their authorization: the fixation of their unfixed performance and the reproduction of such fixation.  Performers shall also have the possibility of preventing the following acts when undertaken without their authorization: the broadcasting by wireless means and the communication to the public of their live performance.

forms of writing, printing, engravings, etchings, etc., by which the ideas in the mind of the author are given visible expression").  The few courts that have analyzed the anti-bootlegging statute have held that unfixed live musical records are plainly not "writings" within the meaning of the Copyright Clause.  See, e.g., Moghadam, 175 F.3d at 1274 ("[A]lthough in the modern era the term 'Writings' allows Congress to extend copyright protection to a great many things, those things have always involved some fixed, tangible and durable form."); David Nimmer, The End of Copyright, 48 Vand. L.Rev. 1385, 1409 (1995) ("[N]o respectable interpretation of the word 'Writings' embraces an untaped performance of someone singing at Carnegie Hall.").

Second, notwithstanding the anti-bootlegging statute's placement in Chapter 17 of the United States Code, the statute does not incorporate by express reference most of the Copyright Act's provisions.  See 17 U.S.C. § 1101(a)(3) (referencing only a portion of the Copyright Act's remedies—those contained in sections 502 through 505—and leaving unmentioned any other provisions in Title 17).  Thus, courts have held that unincorporated Copyright Act sections are inapplicable to the anti-bootlegging statute.  See, e.g., Willis v. Knight, No. 1:08-CV-705-ODE, 2008 WL 11336133, at *6 (N.D. Ga. Oct. 20, 2008) (holding that 17 U.S.C. § 411's provision that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made" is inapplicable to actions brought under 17 U.S.C. § 1101(a)); KISS Catalog v. Passport Int'l Prods., Inc., 350 F. Supp. 2d 823, 832 (C.D. Cal. 2004) (holding that the durational limits on copyright protection contained in 17 U.S.C. § 302 were not incorporated into the anti-bootlegging statute), vacated on other grounds, Kiss Catalog, Ltd. v. Passport Int'l Prods., Inc., 405 F. Supp. 2d 1169 (C.D. Cal. 2005).

Case law interpreting the civil anti-bootlegging statute is sparse and largely concerns the statute's constitutionality.[12] Given the statute's relatively rare appearance in reported cases, it is unsurprising that this lawsuit presents a novel question about the statute's scope: whether its protections are descendible and may be invoked by the estate of a once-protected performer. This important threshold consideration—whether section 1101's protections are descendible and, if they are not, whether an estate has standing to assert claims under section 1101—has never been addressed by a federal court and has not been briefed by the parties to this action. Accordingly, if Comerica so wishes, it may file a supplemental brief as to its section 1101 claim within 21 days of the issuance of this Order; should Comerica do so, Habib may respond with his own supplemental brief by no later than 14 days following Comerica's submission.

> b.    Habib's Implied License Defense

Notwithstanding the lack of resolution at this juncture as to these threshold questions, the Court deems it prudent to address Habib's sole defense to Comerica's anti-bootlegging statute claim: that Prince, through quoted statements in a February 5, 2014 BBC article, granted Habib—and apparently all other Prince fans—an implied license to record and distribute Prince's

---

[12] Several courts have examined whether section 1101(a) and its criminal counterpart, 18 U.S.C. § 2319A, are constitutional. See Moghadam, 175 F.3d 1269 (11th Cir. 1999) (holding that 18 U.S.C. § 2319A is a lawful exercise of power under the Commerce Clause); United States v. Martignon, 492 F.3d 140 (2d Cir. 2007) (holding that 18 U.S.C. § 2319A(a)(1) and (3) were validly enacted under the Commerce Clause); KISS Catalog, Ltd., 350 F. Supp. 2d 823 (C.D. Cal. 2004) (holding that the civil anti-bootlegging statute is unconstitutional because its protections are not "for limited Times" and do not concern fixed "writings" as is required by the Copyright Clause), vacated in part by 405 F. Supp. 2d 1169 (C.D. Cal. 2005) (holding that 17 U.S.C. § 1101(a)(3) is a constitutional enactment under the Commerce Clause). While the First Circuit has not considered the constitutionality of either anti-bootlegging statute, the Court finds decisions upholding the statutes under the Commerce Clause persuasive.

live musical performances.  Doc. No. 85 at 14-15 (quoting Prince as stating, "[n]obody sues their fans . . . fans sharing music with each other, that's cool.").

Habib rightly notes that a nonexclusive license to use a copyrighted work—where ownership of the copyright is not transferred—may be granted by a copyright owner in a few ways: in writing, orally, or it "may be implied from conduct which indicates the owner's intent to allow a licensee to use the work."  John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26, 40 (1st Cir. 2003).  "This kind of implied license is, by definition, of limited scope; it 'simply permits the use of a copyrighted work in a particular manner.'"  Estate of Hevia v. Portrio Corp., 602 F.3d 34, 41 (1st Cir. 2010) (quoting I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996)); 3 Nimmer on Copyright § 10.03[A][7] (noting that courts demand that the terms of an implied license, as well as the "identity of the licensee," be "reasonably clear").  Thus, "[u]ses of a copyrighted work that stay within the bounds of an implied license do not infringe the copyright."  Estate of Hevia, 602 F.3d at 41.

"The burden of proving the existence of such a license is on the party claiming its protection, the licensee."  Danielson, 322 F.3d at 40 (noting that "[i]mplied licenses are found only in narrow circumstances.").  The First Circuit has underscored that "the touchstone for finding an implied license . . . is intent," Estate of Hevia, 602 F.3d at 41, but has also directed courts to consider additional, non-exhaustive factors, including:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

Danielson, 322 F.3d at 41.  Here, none of the relevant factors tend to demonstrate the existence of an implied license.  As Comerica notes, "Prince's broad, alleged statement made to the

general public does not set out any license terms, does not demonstrate an intent to contract with Habib, and indeed plainly has no relation to Habib." Doc. No. 106 at 6. Thus, based on the evidence before the Court, should an anti-bootlegging claim lie in this case—a determination that the Court has not reached—Habib's implied license defense will fail.

B.    Habib's Counterclaim

In response to Comerica's two claims, Habib claims that the take down notices sent by Comerica's agent, MarkMonitor, contained "knowingly material misrepresent[ations]," in contravention of the DMCA, 17 U.S.C. § 512(f).

Under the DMCA, "a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed" may send a take-down notification "to the designated agent of a service provider," so long as that notification contains certain information, including, inter alia: "[i]dentification of the copyrighted work claimed to have been infringed"; and "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3). Here, the undisputed evidence before the Court indicates that MarkMonitor had, at the very least, a "good faith belief" that Habib's videos infringed Prince's copyrighted musical compositions. See Doc. No. 81-8 (describing MarkMonitor's process for identifying potentially infringing material, including an initial consideration of fair use before a take-down notification is sent). Habib has offered no evidence to the contrary; in fact, as Comerica notes, Habib "did not even take discovery from MarkMonitor." Doc. No. 102 at 16. When, as here, the moving party "ha[s] not supplied a factual basis on which to find . . . that [the] plaintiff[], in pursuing takedown notices, made a knowing material misrepresentation," summary judgment is appropriate. Stern v. Lavender, 319 F. Supp. 3d 650, 684 (S.D.N.Y. 2018). Accordingly, as

Habib has "failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," Celotex Corp., 477 U.S. at 323, Habib's cross-motion for summary judgment as to his counterclaim is DENIED and Comerica's motion for summary judgement as to Habib's counterclaim is ALLOWED.

      C.      <u>Injunctive Relief</u>

"A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156-57 (2010) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)) (alterations and quotation marks omitted). A permanent injunction is an extraordinary remedy that may be granted in the exercise of a court's sound discretion. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). While injunctive relief is extraordinary, "[a] finding of liability for copyright infringement, combined with the threat of future infringement, justifies the imposition of a permanent injunction." Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory, 780 F. Supp. 2d 121, 123 (D. Mass. 2011) (quoting Cipes v. Mikasa, Inc., 404 F.Supp.2d 367, 371 (D. Mass. 2005)).

Here, the Court agrees with Comerica's assessment that "[a]bsent a permanent injunction, further infringement is likely." Doc. No. 83 at 30. Throughout the course of this litigation, Habib has refused to engage with the demands of copyright law, has continued to post potentially infringing videos, and has antagonized opposing counsel, see Doc. No. 81-3 at 10 (tweeting

disparaging remarks about Comerica's counsel), even after Comerica "made several attempts to resolve the case on terms that merely required Habib to refrain from distributing unauthorized Prince videos in the future." Doc. No. 81-9 at 3. The Court concludes that "a threat of future infringement remains, in light of [Habib's] repeated, current, and past acts." Situation Mgmt. Sys., Inc. v. Lamoco Consulting, LLC, No. 06-11557-RGS, 2011 WL 1226114, at *6 (D. Mass. Mar. 30, 2011). Thus, the Court ALLOWS Comerica's motion for a permanent injunction.

IV.    CONCLUSION

       For the foregoing reasons, Comerica's Motion for Partial Summary Judgment (Doc. No. 77) is ALLOWED IN PART and Habib's Cross Motion for Summary Judgment (Doc. No. 84) is DENIED.

       As discussed above, Comerica may file a supplemental brief as to its section 1101 claim by January 27, 2020. Habib may respond with his own supplemental brief by no later than 14 days following Comerica's submission. A trial on damages shall commence on March 2, 2020. See Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 355 (1998) ("[I]f a party so demands, a jury must determine the actual amount of statutory damages under § 504(c) in order to preserve the substance of the common-law right of trial by jury.") (internal quotation marks omitted). A separate order will issue establishing pre-trial deadlines.

                                    SO ORDERED.


                                     /s/ Leo T. Sorokin
                                    Leo T. Sorokin
                                    United States District Judge